UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Kristen Inserra,
     Claimant

     v.

Nancy A. Berryhill, Acting Commissioner,
Social Security Administration,
     Defendant

Case No. 17-cv-197-SM
Opinion No. 2018 DNH 036

**O R D E R**

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), claimant, Kristen Inserra, moves to reverse or vacate the Acting Commissioner's decision denying her applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income Benefits under Title XVI. See 42 U.S.C. §§ 423, 1381-1383c (collectively, the "Act"). Claimant asserts, among other things, that the ALJ failed to give appropriate weight to the opinions of her treating physician. The Acting Commissioner objects and moves for an order affirming her decision.

For the reasons discussed below, claimant's motion is granted, and the Acting Commissioner's motion is denied.

**Factual Background**

I.   Procedural History.

In September of 2013, claimant filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging that she was disabled and had been unable to work since July 18, 2013.  Claimant was 42 years old at the time and had acquired sufficient quarters of coverage to remain insured through December 31, 2017.  Claimant's applications were denied and she requested a hearing before an Administrative Law Judge ("ALJ").

In January of 2016, claimant, her attorney, and an impartial vocational expert appeared before an ALJ, who considered claimant's applications de novo.  Seven weeks later, the ALJ issued his written decision, concluding that claimant was not disabled, as that term is defined in the Act, at any time prior to the date of his decision.  Claimant then requested review by the Appeals Council.  That request was denied. Accordingly, the ALJ's denial of claimant's applications for benefits became the final decision of the Acting Commissioner, subject to judicial review.  Subsequently, claimant filed a timely action in this court, asserting that the ALJ's decision is not supported by substantial evidence.

Claimant then filed a "Motion to Reverse" the decision of the Commissioner (document no. 7). In response, the Acting Commissioner filed a "Motion for an Order Affirming the Decision of the Commissioner" (document no. 11). Those motions are pending.

II. Stipulated Facts.

Pursuant to this court's Local Rule 9.1, the parties have submitted a joint statement of stipulated facts which, because it is part of the court's record (document no. 12), need not be recounted in this opinion. Those facts relevant to the disposition of this matter are discussed as appropriate.

**Standard of Review**

I. "Substantial Evidence" and Deferential Review.

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Factual findings and credibility determinations made by the Commissioner are conclusive if supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c)(3). See also Irlanda Ortiz v. Secretary of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Importantly, it is something less than a preponderance of the evidence, so the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966). See also Richardson v. Perales, 402 U.S. 389, 401 (1971).

II. The Parties' Respective Burdens.

An individual seeking SSI and/or DIB benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). See also 42 U.S.C. § 1382c(a)(3). The Act places a heavy initial burden on the claimant to establish the existence of a disabling impairment. See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health & Human Services, 944 F.2d 1, 5 (1st Cir. 1991). To satisfy that burden, the claimant must prove, by a preponderance of the evidence, that her impairment prevents her from performing her

former type of work. See Manso-Pizarro v. Secretary of Health & Human Services, 76 F.3d 15, 17 (1st Cir. 1996); Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985). If the claimant demonstrates an inability to perform her previous work, the burden shifts to the Commissioner to show that there are other jobs in the national economy that she can perform, in light of her age, education, and prior work experience. See Vazquez v. Secretary of Health & Human Services, 683 F.2d 1, 2 (1st Cir. 1982). See also 20 C.F.R. §§ 404.1512, 404.1560, 416.912, and 416.960. Ultimately, a claimant is disabled only if her:

> physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A). See also 42 U.S.C. § 1382c(a)(3)(B).

With those principles in mind, the court reviews claimant's motion to reverse and the Acting Commissioner's motion to affirm her decision.

**Background - The ALJ's Findings**

In concluding that claimant was not disabled within the meaning of the Act, the ALJ properly employed the mandatory five-step sequential evaluation process described in 20 C.F.R. §§ 404.1520 and 416.920. See generally Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, he first determined that claimant had not been engaged in substantial gainful employment since her alleged onset of disability: July 18, 2013. Admin. Rec. at 16. Next, he concluded that claimant suffers from the following severe impairments: "diabetes mellitus, diabetic neuropathy, and right shoulder impairment." Id. at 17. But, the ALJ determined that claimant's impairments, whether considered alone or in combination, did not meet or medically equal one of the impairments listed in Part 404, Subpart P, Appendix 1. Admin. Rec. at 19.

Next, the ALJ concluded that claimant retained the residual functional capacity to perform the exertional demands of "light" work, subject to the following limitations:

> claimant can only stand and/or walk for a total of four hours in an eight-hour day and sit for about six hours in an eight-hour day. The claimant has unlimited use of her hands and feet to push and pull. The claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, and balance, kneel, crouch, stoop, and crawl. The claimant can occasionally reach overhead with her

6

>       right upper extremity and should avoid concentrated
>       exposure to extreme heat, cold, and vibration and all
>       exposure to unprotected heights.

Admin. Rec. at 20. In light of those restrictions, the ALJ concluded that claimant was capable of performing her past relevant work as an account clerk (which the vocational expert testified was performed at both the light and sedentary work level). Id. at 26. See also Id. at 48-49 (vocational expert's testimony about claimant's work history).

Despite having concluded, at step four of the sequential analysis, that claimant is not disabled, the ALJ continued to step five of that analysis and made additional (alternate) findings. Specifically, he considered whether there were any other jobs in the national economy that claimant might perform, despite her impairments. Relying upon the testimony of the vocational expert, the ALJ concluded that, notwithstanding claimant's exertional and non-exertional limitations, "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform." Id. at 26. Consequently, the ALJ concluded that claimant was not "disabled," as that term is defined in the Act, through the date of his decision. Id. at 27.

**Discussion**

I. <u>Claimant's Assertions of Error</u>.

Claimant challenges the ALJ's decision on four grounds, asserting that he erred by: (1) erroneously determining her Residual Functional Capacity ("RFC"); (2) failing to give appropriate weight to the opinions of her treating physician, Dr. Kaploe, while giving inordinate weight to those of state agency consultant, Dr. Fairley; (3) improperly concluding, at step four, that claimant could perform her past relevant work; and (4) relying upon inaccurate and/or unreliable vocational expert testimony that was based upon a flawed residual functional capacity assessment.

Because the court agrees that the ALJ erred in failing to give appropriate weight to the opinions of claimant's treating source (or by failing to adequately justify his decision to give those opinions "little weight"), the court need only address that issue.

II. <u>Medical Source Opinions</u>.

Claimant challenges the weight the ALJ afforded to the opinions of her primary care physician, Dr. Michael Kaploe, a physician at Dartmouth-Hitchcock Medical Center, in Lebanon, New Hampshire. Specifically, claimant asserts that the ALJ

improperly discounted Dr. Kaploe's opinions based upon unsupported speculation that he was a biased and unreliable source. She also says the ALJ failed to properly consider substantial evidence that was introduced into the record after Dr. Hugh Fairley (the non-examining state agency physician) conducted his review.

Turning first to claimant's argument that the ALJ improperly speculated about potential (though entirely undocumented) biases on the part of Dr. Kaploe, her point is well taken. The ALJ seems to have taken to including in his written decisions boilerplate language aimed at routinely undermining the credibility of primary care physicians. Here, that language appears as follows:

> With regard to the claimant's treating physician opinions, the undersigned finds that such are not entitled to controlling weight. The possibility always exists that a doctor may express an opinion in the effort to assist a patient with whom he or she sympathizes for one reason or another. Patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

Admin. Rec. at 24. This court has previously addressed that (and similar) language. Such language is, of course, decidedly unhelpful. Absent evidence that a treating source's opinion is an "advocacy opinion," language of that sort does nothing to support the ALJ's decision and, instead, merely distracts from the actual issues (indeed, such language might be taken as evincing a general predisposition to find "advocacy" in all treating physicians' opinions simply because they are from treating physicians). See generally Meldrem v. Colvin, No. 16-CV-156-JL, 2017 WL 2257337, at *3, n.9 (D.N.H. May 23, 2017) (noting that the court found "troubling" the ALJ's "unsupported speculation as to [the] physician's motives"); Sunshine v. Berryhill, No. 16-CV-446-LM, 2018 WL 582576, at *5, n.6 (D.N.H. Jan 29, 2018) (finding similar comments about a physician's motives "unhelpful"); Cross v. Colvin, No. 15-CV-331-PB, 2016 WL 8732381, at *7 (D.N.H. Apr. 4, 2016) (noting that the "ALJ's expansive view of 'advocacy opinions' would seem to cover any opinion from a claimant's treating physician that is favorable to the claimant. That is bad enough, but when coupled with the concept of deference to opinions from medical sources who understand the SSA's regulations, see 20 C.F.R. § 404.1527(c)(6), the ALJ's approach turns the SSA's guidance on evaluating medical opinions on its head."). Here, there is no evidence that Dr. Kaploe somehow modified or exaggerated his

professional medical opinions in order to assist claimant in obtaining SSI and/or DIB benefits to which she was not otherwise entitled. Indeed, his diagnoses and opinions are entirely consistent throughout the record.

For example, in January of 2014, Dr. Kaploe completed a Mental Residual Functional Capacity Questionnaire, in which he opined that claimant was "unable to meet competitive standards" in the following categories: maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; and deal with normal stress. Admin. Rec. at 741. The ALJ gave those opinions "little weight," reasoning that Dr. Kaploe is not a specialist in the field and noting that he reported (on that same form) that claimant has "no evidence of mental impairment at follow-up examinations for diabetic management." Id. at 24-25. All of that is true. But, even a cursory review of Dr. Kaploe's opinion reveals that he based those opinions, not exclusively on claimant's psychological impairments, but rather on both the physical and psychological impairments she suffered as a consequence of her severe diabetes and diabetic neuropathy. See, e.g., Id. at 742 ("Patient currently dealing with anxiety surrounding poorly controlled diabetes mellitus type I and financial concerns regarding her care and that of child and

grandchild.  Patient having difficulty with complications related to diabetes and difficulty maintaining regular employment as a result of illness."). To be sure, Dr. Kaploe's opinions are of the sort that are more typically found in a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," but there is no indication he was asked to complete such a form.  The important point is this: that Dr. Kaploe expressed his opinions about claimant's ability to perform work-related activities on arguably the wrong form is not a basis to discount those opinions.

Finally, says claimant, even if the ALJ's speculative musings about Dr. Kaploe's potential biases and his arguable misreading of the import of Dr. Kaploe's opinions, are not, standing alone, enough to warrant remand, the ALJ's improper handling of additional treatment notes (added to the record after Dr. Hugh Fairley, the non-examining state agency physician, issued his opinion) does warrant remand.  Dr. Fairley reviewed claimant's medical records in July of 2014.  He opined that claimant could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; push and/or pull as much as she could lift and/or carry; stand and/or walk for a total of four hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  Admin. Rec. at 65-66.  The ALJ afforded Dr.

Fairley's opinion "great weight." Id. at 25. But, says claimant, substantial medical evidence that both undermined Dr. Fairley's opinions and supported her claimed disability was introduced after Dr. Fairley rendered his opinion. Claimant's memorandum (document no. 7) at 8.

Although the ALJ acknowledged that new evidence, he dismissed it in a single sentence, concluding that none of it "document[ed] any meaningful change or deterioration in the claimant's presentation." Admin. Rec. at 25. Claimant says that conclusion is contradicted by the record. In particular, claimant points to Dr. Kaploe's letter of December, 2015 - issued more than a year after Dr. Fairley conducted his review - in which Dr. Kaploe stated:

> Ms. Inserra's diabetic neuropathy is extremely painful, particularly at her lower extremities. Ms. Inserra has considerable difficulty standing or walking for any considerable period of time. She is currently being managed for her diabetic neuropathy by pain specialists and is requiring significant doses of narcotic medication to be able to perform her activities of daily living. Ms. Inserra has been tried extensively on conservative therapy for her diabetic neuropathy and has not met with much success in this regard. Ms. Inserra's diabetic neuropathy given the extent of her diabetes, is not likely to improve and thus must he medically managed with pain control medications provided by her pain specialist.

* * *

> Ms. Inserra's diabetes mellitus type I, along with her
> significant diabetic neuropathy as well as comorbid
> conditions of delayed gastric emptying (gastroparesis)
> make it extremely difficult for Ms. Inserra to perform
> work on a daily basis. Ms. Inserra has difficulty
> with her activities of daily living due to her
> diabetic neuropathy and is requiring narcotic
> medications for management of the pain associated with
> her diabetic neuropathy.

Admin. Rec. at 1104. At a minimum, those opinions seriously call into question whether, at that point, claimant retained the RFC to stand and walk for up to four hours each day of a workweek (or whether she would even be able to maintain regular attendance and complete a normal workday).

Moreover, Dr. Kaploe's opinions are supported by the medical evidence submitted after Dr. Fairley's review. For example, in September of 2014, physician's assistant Kathleen Keys at PainCare Centers, Merrimack, New Hampshire, noted that claimant's leg pain had been increasing over the past month, often to the point of making it impossible for her to walk. Admin. Rec. at 713. Ms. Keys also noted that claimant's pain is so severe that she is on the "max limits for medication," and, therefore, at risk for opioid dependence (claimant was taking 200 mg of MS Contin three times each day, along with 15 mg of Roxicodone (another opioid painkiller) up to three times each day). Id. at 700. Indeed, Ms. Keys opined that, "I consider

14

this patient to be at moderate risk of morbidity given the severity of pain." Id.

Also supporting Dr. Kaploe's opinion is the fact that in August of 2014, it was noted the claimant's gait had become unsteady, and in February of 2015, she fell down some stairs because she lost her balance. Admin. Rec. at 688. In April, 2015, it was recommended that claimant establish care with a counselor based on worsening anxiety related to her diabetic neuropathy. Id. at 768. In August of that year, claimant had eye surgery to correct a detached retina due to a vitreous hemorrhage related to proliferative diabetic retinopathy. Id. at 630, 633. And, in September of 2015, Dr. Kaploe reported that "monofilament testing to feet bilateral with deficit noted on testing to dorsal aspects of both feet," id. at 759, and the following month claimant reported that she has no sense of hot/cold below the knee, id. at 643.[1]

---

[1] Monofilament testing is a means by which to identify diabetes patients who are at risk for foot ulceration as a result of neuropathy. The test measures a patient's response to pressure. According to one source, "Many prospective studies have confirmed that loss of pressure sensation using the 10-g monofilament is highly predictive of subsequent ulceration." Comprehensive Foot Examination and Risk Assessment, A report of the Task Force of the Foot Care Interest Group of the American Diabetes Association, with endorsement by the American Association of Clinical Endocrinologists (available at http://care.diabetesjournals.org/content/31/8/1679).

In light of the foregoing, and for the reasons set forth in claimant's memoranda, the court is constrained to conclude that the ALJ's finding that the additional treatment notes "do not document any meaningful change or deterioration in the claimant's presentation" is not supported by substantial evidence. As claimant points out, those additional treatment notes and records consisted of nearly 500 pages of medical reports - a substantial portion of which were entirely consistent with Dr. Kaploe's opinions. All of that, in turn, undermines the ALJ's decision to give the opinion of Dr. Kaploe - claimant's primary treating source - less than controlling weight. See 20 C.F.R. § 404.1527(c)(2). See also Social Security Ruling, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, SSR 96-2p, 1996 WL 374188 (July 2, 1996).

## Conclusion

For the foregoing reasons, claimant's motion to reverse the decision of the Acting Commissioner (document no. 7) is granted to the extent claimant seeks a remand for further proceedings. The Acting Commissioner's motion to affirm her decision (document no. 11) is denied.

Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the ALJ dated February 25, 2016, is vacated and this matter is hereby remanded for further proceedings consistent with this order.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

   **SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 21, 2018

cc:   Karen B. Fitzmaurice, Esq.
      Penelope E. Gronbeck, Esq.
      Terry L. Ollila, AUSA